UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID DAVIS,

                       Petitioner,                Case No. 2:19-cv-11920
                                               Hon. Sean F. Cox

v.

CHANDLER CHEEKS,

                       Respondent.
_____/

## OPINION DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY, AND DENYING MOTION FOR EVIDENTIARY HEARING

David Davis is a Michigan prisoner serving a life sentence as a result of his Oakland Circuit Court jury trial conviction of first-degree murder, felon in possession of a firearm, and commission of a felony with a firearm. Davis filed this habeas corpus action under 28 U.S.C. § 2254, raising numerous claims challenging his state conviction. Because all of Davis's claims were either reasonably adjudicated on the merits against him on direct review or were procedurally defaulted during state post-conviction review proceedings, his amended habeas petition will be denied. The Court will also deny Davis a certificate of appealability and deny his pending motion for an evidentiary hearing.

**I**

**A**

The charges against Davis arose from the October 12, 2015, shooting death of his girlfriend, Theresa Diamos. Davis lived with Diamos at her house on North Altadena Street in a residential neighborhood in Royal Oak. The shooting occurred in the middle of the night at Diamos's house, waking and alerting numerous neighbors. Police arrived at the residence within

minutes. After a brief stand-off with Davis, emergency responders retrieved Diamos and transported her to the hospital. Because the close-range shotgun blast shattered Diamos's lung and caused massive blood loss, surgeons were unable to save her life.

The prosecutor's theory of the case was that Davis murdered Diamos because she decided to break up with him and kick him out of her house after he refused to dissociate himself from the Outlaws Motorcycle Club. The defense theory was that unidentified armed intruders—likely members of the Outlaws—had broken into the house, and Davis accidentally shot Diamos while defending himself. Evidence was presented that both Davis and Diamos were, in fact, concerned that members of the club were out to get Davis that night after they learned that Davis was a former law enforcement officer.

Diamos's mother, Donna Pulcini, testified at trial that her daughter lived with Davis at the Altadena residence. (ECF No. 8-9, at 8.) She explained that Diamos had a job as a financial analyst and financially supported Davis. (*Id.* at 10.) In August 2015, a few months before her death, Diamos drove to her mother's cottage and told her that she was going to break up with Davis. (*Id.* at 12-13.) Diamos hid her car at a neighbor's house in case Davis came looking for her. (*Id.* at 13.) Diamos complained to her mother that whenever she tried to break up with Davis he would not move out of the house. (*Id.* at 16, 23-30.)

Robert Sad, Diamos's cousin, testified that Davis and Diamos started to seriously date before Davis went to prison, and started up the relationship again after he got out in 2011. (ECF No. 8-11, at 27-32.) In 2013, Sad started to see problems in the relationship. Sometime in the Fall of 2013 Diamos called Sad and told him that she needed to spend the night. (*Id.* at 33.) She said that Davis had been coming home intoxicated and frightened her when he yelled and screamed at her. (*Id.*) She told Sad that she wanted to break up with Davis. (*Id.* at 34.)

In 2014, Davis told Sad that he wanted to become a member of the Outlaws and wanted to be an enforcer for the club. (*Id.* at 36.) In March of that year Diamos told Sad that things were getting worse. Davis would get angry, he threatened "to beat the shit" out of everyone in her family, and she was afraid of him. (*Id.* at 37-42.) He would stay at the Outlaws club for days and then come home drunk and angry. (*Id.*) Diamos tried to break up with Davis, but he needed time to find a way to support himself before moving out. (*Id.*)

Between March 2014 and August 2015, Sad spoke with Diamos multiple times, and she said she wanted to end the relationship with Davis. But Davis scared her, so she did things to try to appease him. (*Id.* at 42-53.) In August 2015, Sad visited Diamos at the family cottage. (*Id.*) Diamos was hiding there and told him that she was afraid for her life. (*Id.* at 43-44.) Diamos was "a broken person at this point." (*Id.* at 44.) She revealed to Sad for the first time how Davis had been violent with other women, and she told him that she had given Davis thirty days to move out. (*Id.* at 45.) She was going to offer Davis $5,000 to leave, but he never moved out. (*Id.* at 45-47.)

Joanne Sad testified that she was Robert Sad's ex-wife. (*Id.* at 54.) She testified that Diamos told her that Davis would come home after several-day binges and be angry and violent. She said she was scared of Davis (*Id.* at 58.) Meanwhile, Davis complained to Joanne that Diamos was being unfair for wanting him to quit the Outlaws. (*Id.* at 61-62.)

Jody Munro testified that she knew Diamos and Davis. (*Id.* at 65-66.) Diamos told her in 2014 that the relationship was not going well. (*Id.* at 66.) In August 2015, Munro visited Diamos at the family cottage (*Id.* at 67.) Theresa was hiding from Davis and was afraid of him. (*Id.* at 67-69.) Diamos planned to break up, but she later told Munro that they got back together. (*Id.* at 72.)

Corbin Kelley also testified that he knew Diamos and Davis. (*Id.* at 78-79.) Diamos told him in July or August 2015 that they were having problems, and that she was going to end the

3

relationship if things did not change. (*Id.* at 80-84). Diamos was nervous about how Davis would react and thought it could be dangerous. (*Id.* at 85-86.)

Kim Falk testified that she was close friends with Diamos. (*Id.* at 95.) Falk and Diamos took annual trips to Florida. They planned to go in November 2015. (*Id.* at 100.) Diamos did not want Davis to find out that she was going. (*Id.* at 100.) Diamos told Falk that she was trying to figure out how to kick Davis out of the house. (*Id.* at 104.)

On August 16, 2015, Diamos texted Falk that she had broken up with Davis and was going to hide out for the week at the family cottage. (*Id.* at 102.) Davis was supposed be out of her house by Labor Day, but it never happened. (*Id.* at 104-11.) Falk saw Diamos again on September 21, 2015. Diamos told her that she resolved to stop paying for Davis's child support (he had children from prior relationships), other bills, and truck lease. She told Falk that the relationship was getting worse. (*Id*. at 112.)

Michael Richardson, a police officer in Ohio, testified that on October 11, 2015, he was dispatched for a welfare check on Davis at the Outlaws Club near Dayton. He spoke with Diamos by phone. (ECF No. 8-12, at 269-79.) After initially being told by people outside the club that Davis was not there, Davis eventually came out but was unwilling to speak with Richardson. (*Id.* at 272-76, 284.) Richardson later spoke by phone with Diamos and Davis, and Davis thanked him for helping him. (*Id.* at 290.)

Ohio State Trooper James Davis testified that later that day he stopped Davis, who was riding a motorcycle on the shoulder of a rural road in Ohio. (ECF No. 8-13, at 7-8.) Davis told the trooper that he was being followed. (*Id.* at 9, 21). Davis said that he had been hanging around the Outlaws Motorcycle Club, and someone found out he was a former Wayne County Sheriff's Deputy. (*Id.* at 26-29.)

The trooper also spoke with Diamos by phone, who was appreciative of his assistance. (*Id.* at 11, 30.) Diamos arrived at the scene in a vehicle with another person. (*Id.* at 12, 33.) Davis drove away with Diamos in her vehicle, and the other person drove away on Davis's motorcycle. (*Id.* at 13.) Davis had texted Diamos to call police because members of the motorcycle club had "tried to jump him." (*Id.* at 36.) Davis did not want to file a police report because he did not want any trouble with the club. (*Id.* at 36.)

Diamos's next-door neighbor, Jeffery Wright, testified that later on the evening of October 11, 2015, Diamos asked him if his son-in-law, a police officer, was working that night. (ECF No. 8-9, at 155-56.) Diamos said that there could be some problems that night at their house and asked if someone could check on the house. (*Id.* at 156.)

Douglas Featherstone testified that he lived directly behind Diamos's house and knew both Diamos and Davis. (ECF No. 8-12, at 132-134.) Diamos called him around 8:15 p.m. that night. (*Id.* at 134.) She told him that Davis thought he saw something in Featherstone's backyard. (*Id.* at 136.) Featherstone checked, but he did not see anything. (*Id.* at 137, 143-45.)

Margaret Eagan testified that she lived on the block next to Altadena. (*Id.* at 102-04). At around 1:00 a.m. on October 12, 2015, she was sitting in her yard—the side facing Altadena— when she heard arguing coming from between two houses on that street. (*Id.* at 104-5.) Eagan heard a female voice and at least one, but perhaps two, male voices. (*Id.* at 106.) The argument lasted at least half an hour before Eagan went inside and went to sleep. (*Id.* at 107.)

Sandra Wright testified that she was awake in bed during the early morning hours of October 12, 2015, and her bedroom window was open. (*Id.* at 125.) At around 2:45 a.m. she heard a boom from the back of Diamos's house. (*Id.* at 126.) Wright walked towards the front of her house and heard a gunshot. (*Id.* at 126, 136.) She went out onto the front porch and saw Davis

standing in front of his house. Davis yelled at Wright to call 9-1-1 because Diamos had been shot. (*Id.* at 127.) Wright did not see whether Davis was holding a shotgun. (*Id.* at 138.) Wright called 9-1-1. (*Id.* at 128.)

Jeffrey Wright testified that he was awakened by the boom. (*Id.* at 141, 152.) He went outside and saw Davis standing near the street corner looking around. (*Id.* at 142-43.) He did not recall whether Davis was holding anything. (*Id.* at 149.)

Claudine Goeddeke testified that her property bordered Diamos's house. (*Id.* at 161-63.) Goeddeke was awakened that night by a gunshot coming from the direction of Diamos's house. (*Id.* at 172-74). A few seconds later, she heard a person screaming. (*Id.* at 174-75.)

Steven Willey testified that he lived about one-hundred yards from Diamos's house. (ECF No. 8-11, at 250.) That night Willey's wife woke him up at about 2:45 a.m. He went to his front window and saw a man wearing boxers and a tank top standing at the street corner. (*Id.* at 251-54). Willey could not tell who it was, but he did not think it was Davis. (*Id.* at 252-54). The man had nothing in his hands, appeared to be looking around, and then walked back in the direction of Diamos's house. (*Id.* at 254-62.)

Beverly Willey testified that she was awake at the time of the incident. She heard what she believed was a man and woman arguing, she then heard a gunshot, and she then heard a man yell, "what the hell are you doing?" (*Id.* at 268-77). She looked outside and saw a man standing on the corner wearing a tank top and boxers, but she could not identify whether it was Davis or not. (*Id.* at 272-75.)

Jodell Muehlenbrunch, who lived across the street from Diamos, testified that she woke up to a loud noise that night. (*Id.* at 286-87). She heard a lot of yelling from two male voices that sounded angry. (*Id.* at 287-89).

Sarmad Awdish testified that he lived on the block south of the location of the shooting. (*Id.* at 299, 305). He went outside after he heard a gunshot. (*Id.* at 300-07.) He heard what he assumed were drunk male and female voices yelling and screaming. (*Id.* at 301, 307-09.)

Lauren Ebejer testified that she lived at the corner south of the location of the incident, a few houses away. (*Id.* at 310, 318.) She was awake when she heard a loud bang. (*Id.* at 312.) Ebejer then heard one or more male voices outside. (*Id.* at 313, 321.) The voices were yelling and argumentative. (*Id.* at 314.) She heard one voice say, "someone call an ambulance," so she called 9-1-1. (*Id.* at 315.)

Gail Bryant testified that she lived right across the street from Diamos's house. (*Id.* at 326-7, 335.) She was awakened by "a loud shotgun noise." (*Id.* at 328.) She heard shouting from a male voice and saw a man standing in the lot next to Diamos's. (*Id.* at 330-32.) Bryant's housemate, Debra Hand, looked outside and said that the man was Davis. (*Id.* at 331.) The man ran back into Diamos's house, where he was visible in the front window until police arrived. (*Id.* at 334-43.)

Barbara French testified that she lived on the block to the west of Altadena.  (ECF No. 8-12, at 117.) At around 2:15 a.m., from her open bedroom window, she heard loud voices, a male and female. (*Id.* at 117-19.) A few minutes later, she heard a woman scream and then gunshots. (*Id.* at 118, 124.) In her written statement to police, French wrote that it was two men shouting. (*Id.* at 120, 126.)

Douglas Featherstone testified that his girlfriend, Sandra Oliver, woke him up around 2:15-2:30 a.m., and then he heard the police outside. (*Id.* at 139.) Oliver told him that she heard two men yelling. (*Id.* at 172.)

Sandra Oliver testified that she woke up to more than one male voice screaming and arguing sometime before 3:00 a.m. (*Id.* at 153-58). Oliver did not hear a gunshot. (*Id.* at 160.)

Olivia Keuten lived a few houses north of Theresa and Davis. (*Id.* at 176-77.) She woke up to the sound of a gunshot, and then she heard yelling. (*Id.* at 178-86.)

Christopher Malloy testified that he lived across the street and south of the incident. A bang woke him up. He went downstairs and opened his front door. He heard two male voices. One yelled, "motherfucker," and then he heard the other say something about chest compressions. The police arrived a short time thereafter. (*Id.* at 189-95).

Officer Brian Kucel of the Royal Oak Police Department testified that he was dispatched to 815 Altadena for shots fired in the early morning hours of October 12, 2015. (ECF No. 8-9, at 37, 68.) Several other units also responded to the scene. (*Id.* at 39.) As the officers approached the house a man later identified as Davis exited the front door and stopped in the doorway. (*Id.* at 42.) Davis was holding a shotgun. (*Id.* at 44.) Kucel ordered Davis to drop the gun, but Davis would not comply. (*Id.* at 47, 62.) Davis yelled that he was an "ex-cop" and that Theresa needed CPR inside. (*Id.* at 48, 64.) Davis ran back into the house with the shotgun. (*Id.* at 48.) More officers arrived and positioned themselves around the house. (*Id.*)

Davis came back outside about a minute later, still holding the shotgun. (*Id.* at 49, 65.) He again refused orders to drop the weapon, and then he went back into the house. (*Id.* at 50, 72.) About a minute later he came back out without the shotgun and was secured by police. (*Id.* at 50, 53, 70.)

Responding Royal Oak Officer Christopher Platt testified that he heard Davis say that there was a shooter inside the house and that Theresa needed help. (*Id.* at 88, 93.) Davis said the intruder broke into the home and tried to attack them while he and Diamos were sleeping. (*Id.* at 102.) Davis said he saw the other man in the hallway, grabbed the shotgun, and fired a round in his direction while he was lying in bed. (*Id.* at 105.) Davis believed he had shot the intruder, who he

said was armed with a knife. (*Id.* at 90, 94-95.) Davis told him that there had been a "fire fight" inside the house and that he had shot Diamos, and she needed assistance. (*Id.* at 90-92.)

Because of concerns about the possibility of an armed threat remaining inside the house due to Davis's statement about an intruder, and the fact Davis put the shotgun back in the house, officers waited for more support to arrive before entering the home and extracting Diamos. (*Id.* at 51-53, 88-93.)

Officer Mark Cuddeback testified to a similar account of the police response. He was part of the team that went inside to retrieve Diamos. (*Id.* at 224-30.) No intruder was seen inside the house or observed leaving. (*Id.* at 230.)

Another officer testified that after Davis was secured, he said that the shooting was an accident and that there was someone else in the house. (*Id.* at 266.) Officer Richard Chipman explained that there was a twenty-minute delay in entering the house because of Davis's actions and statements. (*Id.* at 278-83, 300.) Chipman did not see any signs of a struggle inside the home or evidence of forced entry. (T2 297). Officer Jimmy Elrod gave a similar account of police interactions with Davis. (EFC No. 8-13, at 45.)

Detective Tim Davis of the Royal Oak Police Department testified that he later saw Davis at the police station and noted no signs of a physical struggle or injuries. (*Id.* at 202, 208.) The detective believed that Davis was pretending to cry. (*Id.* at 204.)

Dr. Felicia Ivascu testified that she operated on Diamos. (ECF No. 8-9, at 236.) She had a gunshot wound to the chest which injured her lungs, and her heart was not beating. (*Id.* at 242.) Dr. Ivascu testified if the victim were seen in the first hour after the injury, there was a chance she would have been treatable. (*Id.* at 243, 246.) But by the time the victim was at the hospital, she had lost too much blood. (*Id.* at 246-247.)

Dr. Ruben Ortiz-Reyes, a forensic pathologist, performed the autopsy. (*Id.* at 190.) There was large damage in the right upper side of the chest where there was an entry wound. (*Id.* at 191.) The wound showed stippling, indicating that the gun was fired close to the body. (*Id.* at 191.) There were four exit wounds on the back of the victim. (*Id.* at 193.) The right lung had been shredded. (*Id.* at 194.) The shot had a downward trajectory, suggesting that the victim was either bent over or on her knees when she was shot. (*Id.* at 204.)

Brigid Lockhart, an evidence technician, surveyed the scene and saw a blood stain area on the wall of the hallway near the kitchen consistent with expirated blood. (ECF No. 8-10, at 36-52.) There was a bloody drag path created by officers removing the victim. (*Id.* at 52, 74-75.) Davis's sleeveless tee shirt and boxer shorts had areas of blood transfer stains. (*Id.* at 60-68.)

Rachel Grace, another evidence technician, examined the entrances to the house and found no evidence of forced entry. (*Id.* at 90-84.) There were no tool marks or damage on any of the locks or deadbolts, there were no cut or removed screens, and there was no damage to windows or doors. (*Id.* at 85.) Three fired shotgun shell casings were found at the scene. (*Id.* at 93.) One 12-gauge fired casing was found in the neighbor's driveway. (*Id.* at 92.) Another was found in the kitchen. (*Id.* at 82, 90, 247.) And a third was found under the bed in the master bedroom. (*Id.* at 123.) There was also an unfired shell on a table in the living room at the front of the house. (*Id.* at 139.) The shotgun seized from inside the house was determined to have fired all three shells. (*Id.* at 93, 145.) A 9 mm handgun was also found near the front entranceway, but no fired 9 mm casings were found. (*Id.* at 138, 220.)

There was evidence indicating that the shotgun was fired at a downward angle from the kitchen into a hallway where the victim was found. (*Id.* at 86-88, 163-64.) An evaluation of the victim's shirt showed singeing, indicating a close-range shot from three inches to one foot. (*Id.* at

198-203, 212.) There was a great deal of blood in the hallway where the victim was found. (*Id.* at 106.) There was also evidence of the shotgun being fired from the master bedroom toward an office at the back of the house. (*Id.* at 87.) The angle of the shot was not possible if the shooter had been lying in the bed in the master bedroom. (*Id.* at 87, 118, 165-166.) Shotgun pellets were recovered from the wall adjacent to the kitchen. (ECF No. 8-11, at 14.)

Deputy Robert Koteles testified that he inspected the house and determined that all the windows were locked. (ECF No. 8-12, at 22.) Two latent prints were taken from a rear sliding screen door, but the quality was insufficient for evaluation. (*Id.* at 25, 30.) A print found on a sliding glass door did not match Davis, but the poor quality of Diamos's known prints prevented a comparison. (*Id.* at 31.) An examination of the shotgun revealed blood on the slide and splatter near the barrel. (*Id.* at 33-36).

Melinda Jackson and Ashley Bolahan from the MSP Crime Lab testified that blood matching a mix of Davis and Diamos's was found on Davis's right middle finger. (*Id.* at 59, 82.) The victim's blood was found on the front porch steps and interior floors. (*Id.* at 59, 83-84.) Blood on the shotgun slide was a mixture of the victims' and a male, but the quantity was insufficient to determine the male's identity. (*Id.* at 85-87.)

Royal Oak Detective Tim Wood took photographs of Davis showing a lack of injuries. (*Id.* at 201-213, 216, 219-221.) Wood observed Davis over the next few days and heard him sporadically make crying sounds without tears. (*Id.* at 204.) Davis would also wipe away non-existent tears. (*Id.* at 204.)

Wood testified that the windows of the house were locked when the police arrived, and there was no indication that they had been opened or tampered with. (*Id.* at 225.) Wood laid on the

bed in the master bedroom and opined that one could not fire the shot that went into the office from that position. (*Id.* at 226-27.)

Several witnesses testified about Davis's violent conduct towards his former romantic partners. Lisa Wasil testified that she was married to Davis for a little over a year in 2004. (ECF No. 8-10, at 12-13.) Davis was physically abusive during the relationship, and she described several examples. (*Id.* at 13-22.) Wasil obtained a PPO against Davis and divorced him. (*Id.* at 19.) She testified that Davis had been convicted of assault with intent to do great bodily harm for beating, punching, kicking, and holding a knife to her neck, and he was sentenced to prison. (*Id.* at 29, 34.)

Theresa Jarosz testified that she was married to Mr. Davis in 1993 and divorced him in 1997. (ECF No. 8-11, at 126.) Jarosz stated that Davis was physically and verbally abusive. (*Id.* at 128, 144.)

Tamara Campbell testified that she dated Davis in 2003-2004. (*Id.* at 153.) She testified about two physical altercations, one of which resulted in his conviction for assault and battery. (*Id.* at 156-66).

Amy Collier testified that she dated Davis for several months in 2004. (*Id.* at 177.) Collier testified about an incident of physical abuse that occurred while they were on vacation. (*Id.* at 178-9, 181.)

Sheila Walker testified that she was married to Davis from 1999 to 2001. (*Id.* at 203, 219.) Walker described incidents where Davis physically abused her. (*Id.* at 204-10.) She obtained personal protection orders against Davis. (*Id.* at 244.)

Based on this evidence the jury found Davis guilty as charged, and he was sentenced to mandatory life imprisonment.

**B**

Following his conviction, Davis filed a direct appeal. His appellate counsel filed a brief on appeal that raised the following claims:

I. The trial court reversibly erred and violated Mr. Davis' constitutional due process rights in wrongly admitting evidence of prior criminal conduct under MCL 768.27B and MRE 404(b).

II. The trial court violated Mr. Davis' due process rights by admitting the decedent's numerous hearsay statements under MRE 803(3).

III. The evidence of premeditated, first-degree murder was insufficient and defendant's convictions represent a denial of due process and must be vacated or, in the alterative, reduced.

Davis also filed a supplemental pro se brief that raised four additional claims:

I. The prosecutorial misconduct deprives defendant of a fair trial and deprives anyone of due process.

II. Ineffective assistance of counsel is a due process violation in a capital case which deprives a defendant of a fair and meaningful trial, therefore, not fulfilling the protections under the Mich. Const. 1963, art 1 sec. 17 and 20; U.S. Const. V, VI, and XIV.

III. There was insufficient credible evidence at trial to prove the defendant guilty of this offense of open murder beyond a reasonable doubt and should be overturned.

IV. Defendant was denied his fundamental protections to a fair criminal proceeding by and through the cumulative effect of errors that took place at the hands of the trial court, the prosecution, and the defense counsel.

Because at issue in the present case is a determination of exactly which claims Davis raised on direct appeal as opposed to which ones he raised during state post-conviction review, it is necessary to detail the factual basis for the claims raised in his pro se supplemental brief. With respect to his prosecutorial misconduct claim, Davis asserted: (1) the prosecutor wrongfully opposed admission of evidence that he and Diamos were afraid of an outside threat on the night of the incident, (ECF No. 8-17, PageID.2002-03), and (2) contrary to the prosecutor's arguments,

Diamos was not afraid of Davis on the night of the incident, there was evidence of an intruder, Diamos was shot in the shoulder and not the chest, Davis did not delay the police from entering the house, and a different number of shots were fired than claimed. (*Id.* at 2004-05.)

With respect to the ineffective assistance of trial counsel claim, Davis argued: (1) counsel failed to investigate the case and call firearms and forensics expert witnesses, (*Id.* at 2006), and (2) counsel failed to present evidence that on the evening of the incident Diamos and Davis had reconciled and were concerned about an outside threat. (*Id.* at 2007-08.)

Davis also claimed that the evidence was insufficient to sustain his murder conviction because there was no eyewitness testimony that Davis was the shooter. (*Id.* at 2010-14.) Finally, Davis claimed that the cumulation of the alleged errors entitled him to reversal. (*Id.* at 2014-16.)

The Michigan Court of Appeals affirmed Davis's convictions in an unpublished opinion. *People v. Davis*, No. 335051, 2018 WL 1768072 (Mich. Ct. App. Apr. 12, 2018).

Davis subsequently filed an application for leave to appeal in the Michigan Supreme Court. The pro se application raised the same claims that were presented to the Michigan Court of Appeals in both briefs. The Michigan Supreme Court denied the application by standard form order. *People v. Davis*, 920 N.W.2d 593 (Mich. 2018) (Table).

Petitioner subsequently filed his initial federal habeas petition, enumerating five claims: (1) right to effective assistance of trial counsel, (2) right to misconduct free trial, (3) right to a fundamentally fair trial, (4) right to effective assistance of appellate counsel, and (5) right to due process. (ECF No. 1.) The petition expanded on the broad claim headings, listing numerous sub-claims, including new allegations that had not been presented on direct review. (*Id.*)

Respondent filed a motion to dismiss the petition on lack of exhaustion grounds. (ECF No. 7.) Rather than dismiss the petition, the Court ultimately issued an order staying the petition so

that Davis could return to the state courts and present his inexhausted claims on state post-conviction review. (ECF No. 14.)

Davis thereafter filed a motion for relief from judgment in the trial court. The pleading did not include distinct issue headings. Instead, it consisted of forty-two numbered paragraphs that contained overlapping and meandering allegations challenging various aspects of his trial. The trial court interpreted each numbered paragraph to be raising a distinct claim.

The Court summarizes the issues raised in the motion as follows: (1) the physical evidence contradicts the police opinion evidence as to how the shooting occurred; (2) a note from Juror No. 14 indicates that she was not competent; (3) the jury was inadequately instructed regarding the prior bad acts evidence; (4) the victim's civil suit against Davis prevented him from hiring counsel and presenting a defense; (5) Davis invoked his right to counsel immediately upon police questioning; (6) the trial court erred in admitting the prior bad acts evidence; (7) false testimony from Campbell was admitted regarding prior bad acts; (8) the prosecutor falsely claimed there was no evidence of that an intruder was present on the night of the incident; (9) the prosecutor erroneously commented on Davis's silence; (10) the prosecutor denigrated defense counsel; (11) the prosecutor committed misconduct by making a civic-duty argument; (12) the prosecutor expressed his personal belief in Davis's guilt; (13) the trial court erred in appointing replacement defense counsel; (14) the prosecutor misrepresented the evidence at trial during closing argument and failed to disclose evidence of a white van with Ohio plates leaving the scene of the shooting; (15) the police overlooked other suspects; (16) an investigation might reveal *Brady* violations; (17) Davis was denied access to the courts by the prosecutor urging the victim's family to sue; (18) Davis was forced to default in the civil suit because he was in jail; (19) insufficient evidence was presented at trial to negate self-defense; (20) insufficient evidence was presented to prove malice;

(21) the prosecutor improperly argued the victim's state of mind based on hearsay; (22) the jury was not instructed on self-defense; (23) the prosecutor improperly argued that the victim financially supported Davis and that he acted with premeditation; (24) the trial court erred in failing to grant a directed verdict; (25) the prosecutor misstated the element of premeditation; (26) trial counsel didn't obtain text messages that would have shown he and the victim did not break up; (27) trial counsel didn't obtain computer records that would have shown he and the victim had made wedding plans; (28) the victim's actions before the incident, such as calling the Ohio police to check on Davis's welfare, undermine the prosecutor's theory of the case; (29) trial counsel was ineffective for failing to negotiate a plea bargain; (30) trial counsel improperly conceded guilt to the firearms offenses; (31) trial counsel failed to object to the introduction of inflammatory photos; (32) trial counsel failed to object to prosecutorial misconduct; (33) and (34) appellate counsel ignored meritorious issues on direct appeal; (35) appellate counsel failed to meet with Davis; (36) the Michigan Court of Appeals unreasonably interpreted the trial record; (37) the police failed to locate the alternate suspect from the white vehicle with Ohio plates; (38) the civil suit prevented Davis from defending himself at trial; (39) the Court of Appeals erred when it stated that Davis did not request an evidentiary hearing; (40) the Court of Appeals incorrectly stated that Davis did not want Quesada and Jeffery Wright's statements admitted at trial; (41) Davis was denied the ability to retain defense experts; and (42) the Court of Appeals incorrectly stated that Davis did not explain the need for defense experts.

The trial court denied the motion in a written opinion. (ECF No. 19-4.) The court noted that several of the challenges raised by Davis were claims that had already been rejected by the Michigan Court of Appeals on direct appeal. The court found that those claims could not be relitigated on post-conviction review under Michigan Court Rule 6.508(D)(2). (*Id.*, at

PageID.2561.) With respect to the new claims raised by Davis, the court found that review was barred under Michigan Court Rule 6.508(D)(3) because Davis could have raised the claims on direct appeal, and he failed to show good cause or actual prejudice for his failure to do so. (*Id.*, at PageID.2562-83.)

Davis filed an application for leave to appeal in the Michigan Court of Appeals. The court denied the application because Davis "failed to establish that the trial court erred in denying the motion for relief from judgment." (ECF No. 19-8, PageID.2919.) Davis appealed to the Michigan Supreme Court, but it was denied with citation to Michigan Court Rule 6.508(D). (ECF No. 19-10, PageID.3108.)

Davis then returned to this Court and filed his amended habeas petition. Similar to his motion for relief from judgment filed in the trial court, the pro se pleading is not a model of clarity. The amended petition enumerates four very broad claims, but the body is comprised of wandering allegations that combine and challenge the same features and events of his trial that he raised in both his pro se supplemental appellate brief on direct appeal and in his motion for relief from judgment. The amended petition also seems to revisit and restate the same arguments raised by his appellate counsel on direct appeal. Thus, affording Davis the maximum possible benefit of the doubt, the Court will proceed under the assumption that he is attempting to raise every claim that he exhausted in the state courts on both direct and state post-conviction review.

## II

A § 2254 habeas petition is governed by the heightened standard of review set forth in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. To obtain relief, habeas petitioners who raise claims adjudicated by state courts must "show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly

established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)).

The focus of this standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted).

Ultimately, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Additionally, a state court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III

### A

The Court will start with the claims Davis exhausted on direct appeal. His appellate counsel first asserted in that proceeding that the trial court erred in admitting evidence of Davis's prior bad acts. He also asserted that the trial court erred in admitting hearsay statements from the victim regarding her growing fear of Davis and her intent to break up with him and kick him out of her house. The Michigan Court of Appeals found that the testimony was properly admitted under state evidentiary law. *Davis*, 2018 WL 1768072, *2-9.

18

The prior-acts evidence challenged by Davis involved evidence of domestic assaults against his former partners. The trial court allowed admission of incidents that dated back to more than ten years prior to the shooting. A Michigan statute governing the admissibility of prior domestic assaults provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan Rule of Evidence 403." MICH. COMP. L. § 768.27b(1).

Unlike prior-acts evidence admitted under Michigan Rule of Evidence Rule 404(b), evidence of prior domestic violence is admissible at trial in Michigan "to show a defendant's character or propensity to commit the same act," *People v. Railer*, 792 N.W.2d 776, 780 (Mich. Ct. App. 2010), "as long as the evidence satisfies the 'more probative than prejudicial' balancing test of MRE 403," *People v. Cameron*, 806 N.W.2d 371, 377 (Mich. Ct. App. 2011). Under the statute, evidence of prior domestic violence occurring more than ten years before the charged offense is not admissible "unless the court determines that admitting this evidence is in the interest of justice." MICH. COMP. L. § 768.27b(4).

The admission of the prior domestic assault evidence, even if it was old and used to establish a propensity to commit domestic assaults, does not provide a basis for granting habeas relief because there is no clearly established Supreme Court law that holds that a state violates a defendant's due process rights by admitting such evidence. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Similarly, to the extent that Davis asserts that the evidence should have been excluded under Michigan Rule of Evidence 403 as more prejudicial than probative, the argument likewise does not raise a cognizable issue. An argument that a state court misapplied or unreasonably

applied Rule 403's balancing test is not cognizable on federal habeas review because it asks the Court to evaluate the state court's application of a state evidentiary rule. *See Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000).

It is well-settled that "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review" unless "the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) (punctuation modified); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

Here, though, there was nothing patently unfair about the prior-acts evidence admitted in this case. *See Love v. Carter*, 49 F. App'x 6, 12 (6th Cir. 2002). In conducting the "interests of justice" test under § 768.27b(4), the Michigan Court of Appeals reasonably explained why it was not fundamentally unfair for the evidence to be admitted:

> The prior acts of domestic violence that occurred in 2004 and were admitted by the court under the statute comprised a significant part of the prior acts of domestic violence, and were uniquely probative. As the trial court recognized, the acts underscored a history of abusive behavior, behavior which most often occurred when defendant was told something he did not like or went into a jealous rage. Faced with no witnesses to the crime, and a defense of accident, evidence that defendant had acted violently toward domestic partners when confronted with bad news was highly relevant to the issues presented to the jury. And this evidence revealed that defendant's acts were repeated again and again for a significant number of years. Without that evidence, the jury would not be presented with a complete picture of defendant's violent history with domestic partners. *Cameron*, 291 Mich. App. at 609.

> For example, Tamara Campbell dated defendant in 2004 and testified about two physical altercations that occurred between her and defendant. One episode was spawned by defendant becoming jealous and not being able to contact Campbell. Lisa Wasil, who married defendant in 2004, testified that he was repeatedly physically abusive during their relationship, with most attacks arising from jealousy, a quick mood change, or when Wasil said something that defendant did not like. Amy Collier, also a girlfriend of defendant's in 2004, testified about

an incident of physical abuse that occurred while on vacation as a result of defendant's jealous rage. Evidence of each of these incidents provided the jury with relevant information regarding whether defendant shot the victim by accident or because he became jealous when informed by the victim that she wanted him out of the house.

*Davis*, 2018 WL 1768072, *5-6.

To violate due process, an evidentiary decision must "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (citation omitted). Davis cites no authority recognizing a deeply rooted principle of justice that prohibited admission of evidence of old acts of domestic violence relevant to determining whether he intentionally or accidentally shot his current domestic partner to death. The decision of the state court finding that the evidence was properly admitted therefore did not contravene any principle of clearly established Supreme Court law. *Bugh*, 329 F.3d at 512; *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012).

Similarly with respect to the admission of the victim's out of court statements regarding Davis's threats, her request for him to leave the motorcycle club, her fear of him, her plans to break up with him, her plan to stop supporting him, and her plan to kick him out of her house, Davis raises no cognizable claim. The admissibility of evidence under Michigan's hearsay rules is not cognizable in a habeas corpus proceeding. *See Byrd v. Tessmer*, 82 F. App'x 147, 150 (6th Cir. 2003); *See also Rhea v. Jones*, 622 F. Supp. 2d 562, 589 (W.D. Mich. 2008); *Cathron v. Jones*, 190 F. Supp. 2d 990, 996 (E.D. Mich. 2002). And because the prior statements were not testimonial in nature, no federal Confrontation Clause issue arises. *See Davis v. Washington*, 547 U.S. 813, 823-24 (2006). Nor was the trial rendered fundamentally unfair by admission of the highly relevant prior statements.

21

The two evidentiary claims raised on direct appeal therefore do not merit federal habeas relief.

**B**

Davis's appellate counsel also asserted on direct appeal that insufficient evidence was presented at trial to show that he acted with premeditation and deliberation to sustain his first-degree murder conviction. His pro se supplemental brief asserted that insufficient evidence was presented to show that he was the shooter. The Michigan Court of Appeals, after reciting the constitutional standard governing sufficiency of the evidence claims, rejected the claim on the merits:

> The prosecution presented more than sufficient evidence to support an inference of premeditation and deliberation. The victim told multiple people not long before her death that she wanted to break up with, and was afraid of, defendant. For example, one of the victim's friends testified that the victim said she wanted to leave defendant, but he refused to give up on their relationship. Another friend testified that just weeks before her death, the victim said she would no longer pay defendant's child support or other bills, or support his membership in a motorcycle club. This testimony, combined with that of defendant's ex-wives and ex-girlfriends, supported the prosecution's theory that rather than shooting the victim accidentally, defendant purposely and deliberately killed her for threatening to leave and discontinue her financial support.

> The testimony of neighbors served as further evidence of defendant's premeditation and deliberation. Barbara French testified that she awoke to the sound of loud voices from a man and a woman before the shooting. And Margaret Eagan, another neighbor, testified that she heard arguing and doors slamming from the home defendant and the victim shared beginning at approximately 1:00 a.m. or 1:30 a.m. on October 12, 2015. As the evidence suggests the victim was shot around 2:45 a.m., defendant had ample time to ponder and evaluate his decision to react to the argument by shooting the victim.

> Finally, the evidence presented by the prosecution rebutted defendant's assertion that an armed intruder entered the home, and that he shot the victim during a "fire fight" with that intruder. Police officers testified that they found no evidence of a break-in at the home, and the forensic pathologist assigned to the case found that the victim was shot at close range from a downward trajectory. In addition, because defendant refused to drop his shotgun at the request of the responding police officers, the officers were unable to immediately enter the home and assist

22

the victim. From this evidence, a reasonable juror could conclude that defendant's decision to shoot the victim was premeditated and deliberate.

*Davis*, 2018 WL 1768072, at *7-8.

Under clearly established Supreme Court law, the standard governing sufficiency of the evidence claims is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

A habeas court's "review of a state-court conviction for sufficiency of the evidence is very limited," *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018), because *Jackson* claims are "subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). First, it is the responsibility of the fact finder at trial to decide what conclusions should be drawn from the evidence admitted. *Johnson*, 566 U.S. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). "And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Smith*, 565 U.S. at 2). The question under this standard is whether the state court determination that sufficient evidence was presented "was so insupportable as to fall below the threshold of bare rationality." *Johnson*, 566 U.S. 650, 656 (2012).

The state court reasonably determined that sufficient evidence was presented to sustain Davis's murder conviction. Contrary to suggestions in Davis's amended habeas petition, the evidence allowed the jury to find beyond a reasonable doubt that Davis was the shooter. First, there is the obvious fact that Davis was seen wielding the shotgun used to kill Diamos minutes after she

was shot, the evidence showed that he was the only other person found in the house, and he told officers at the scene that he was the one who fired the shotgun, albeit in self-defense.

As far as the shooting involving defense from an intruder, several police witnesses testified that there were no signs of forced entry, and that the windows were all locked and secured. Police arrived mere minutes after the shooting, and they did not see anyone else present or fleeing. The only evidence presented at trial suggesting the presence of an intruder was the testimony of some neighbors who may have heard more than one male voice arguing or yelling around the time of the incident. Viewing the evidence most favorably to the prosecution, however, the jury may have believed that these witnesses were mistaken about the number or gender of the people they heard. Based on the circumstantial evidence presented, a rationale jury could have found beyond a reasonable doubt that there was no intruder, and that the yelling therefore came from Davis, Diamos, or perhaps other neighbors responding to the chaotic scene.

The evidence also allowed the jury to find beyond a reasonable doubt that Davis acted with premeditation and deliberation. As noted by the state court, Diamos informed multiple people in the months and weeks leading up to the shooting that she feared what Davis would do when she stopped supporting him and kicked him out of her house. The relationship was getting worse, Davis was making threats, and she said that she feared for her life. The prior-acts witnesses testified that Davis had resorted to physical violence against his romantic partners in the past. Several of Diamos's neighbors heard arguing starting as many as two hours before the shooting, suggesting Davis had ample opportunity to consider his actions. And while there was evidence presented regarding a dispute with the Outlaws occurring earlier that day, that incident very well may have precipitated the argument between Davis and Diamos, who demanded that Davis no longer be associated with the club.

Then there is the evidence that Diamos was shot from a distance between a few inches and a foot with a 12-gauge shotgun in the chest from a downward angle. This evidence, viewed most favorably to the prosecution, allowed the jury to conclude that this was not an accidental shooting by an execution-style murder. Finally, viewed most favorably to the prosecution, Davis's conduct when the police arrived suggested that he deliberately sought to ensure that Diamos was dead or beyond hope of recovery by the time first responders reached her.

The Court has no trouble concluding that the determination by the Michigan Court of Appeals that sufficient evidence was presented to sustain Davis's first-degree murder conviction did not fall below the minimal level of "bare rationality." *Johnson*, 566 U.S. at 656. The claim is without merit.

## C

Next, several of Davis's claims of prosecutorial misconduct were presented to the state courts on direct appeal in his pro se supplemental brief. Specifically, Davis asserted that the prosecutor unfairly offered statements made by Diamos over hearsay objections to establish that she feared Davis, but then inconsistently objected on hearsay grounds to the introduction of statements made by Diamos suggesting that she was concerned about trouble from an outside threat on the evening of the incident. He also asserted that that the prosecutor committed misconduct during opening statement and closing argument by misrepresenting the evidence.

The Michigan Court of Appeals rejected the claim as follows:

> Defendant next argues in his Standard 4 brief that the prosecutor committed misconduct by objecting during the testimony of Jeffrey Wright and Steven Willey, neighbors of the victim and defendant, and by misstating facts in evidence during her opening statement and closing arguments.

\*\*\*

25

With regard to the testimony of Jeffrey Wright and Steven Willey,[1] defendant fails to demonstrate that the prosecutor's objections amounted to plain error affecting his substantial rights. The trial court overruled the prosecutor's objections to Wright's testimony, so no harm occurred as a result, and defense counsel acknowledged the validity of the prosecutor's objection to Willey's testimony, and withdrew the improper question.

\*\*\*

Defendant asserts specifically that the prosecutor argued facts not in evidence when she stated that the victim was shot in the chest, that he fired three rounds, and that his actions delayed police assistance to the victim by 30 minutes. But the record evidence overwhelmingly supports these statements. Dr. Felicia Ivascu, the surgeon on call when the victim arrived at the hospital, testified that the victim "presented with an apparent shotgun wound to the upper right chest," and the forensic pathologist who performed the autopsy testified that the victim suffered damage to the chest. Deputy Rachel Grace testified that the police found three fired shell casings at the home defendant and the victim shared. And finally, a police officer testified that the police delayed entry into the home out of concern for officer safety because defendant told them a gunfight with a third party had occurred inside. Accordingly, the prosecutor's statements did not amount to plain error affecting defendant's substantial rights.

*Davis*, 2018 WL 1768072, at \*9-10 (footnote omitted).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). A prosecutor's conduct will violate a criminal defendant's constitutional rights only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of the claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

---

[1] Apart from the testimony from Wright, the claim actually referred to the testimony of Douglas Featherstone and Dana Quesada, and not Willey. It appears the mistake stems from Davis using the wrong transcript citation in his pro se brief. (*See* ECF No. 8-17, PageID.2002, mistakenly citing "T Vol IV" instead of "T Vol V".)

disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Harrington*, 562 U.S. at 103).

Davis first claims that the prosecutor unfairly offered hearsay statements from Diamos when they tended to suggest that she was afraid of him but then inconsistently opposed defense counsel's attempts to offer hearsay statements that she and Davis were concerned about trouble from an outside threat on the evening of the incident. Davis relies on three examples. First, during the direct exam of Sandra Wright, the prosecutor elicited testimony that on Labor Day weekend before the incident, Diamos told her that she wanted Davis to move out. (ECF No. 8-9, at 131-32.) On cross-examination, the prosecutor then objected on hearsay grounds when defense counsel asked Wright if Diamos told her she was concerned and asked for her to contact her deputy son-in-law the evening before the shooting. (*Id.* at 152-57.) Davis ignores the fact that the court overruled the prosecutor's objection and allowed the testimony elicited by defense counsel. (*Id.* at 157.)

Davis next points to an exchange where the prosecutor objected on hearsay grounds when defense counsel asked Douglas Featherstone what Diamos said to him during a phone call on the evening of the incident. (ECF No. 8-12, at 135-138.) Again, the court overruled the hearsay objection and allowed Featherstone to testify that Diamos told him that Davis thought he saw something in Featherstone's backyard. (*Id.* at 135-36.)

Finally, Davis refers to an exchange at trial where defense counsel objected to the introduction of only part of a written statement made by Dana Quesada regarding what Diamos texted her on the evening before the incident. Defense counsel asserted that if any part of the prior statement was admissible, then the whole statement should come in. (*Id.* at 260-67.) When the trial

court agreed with defense counsel and ruled that the entire written statement would be admissible, the prosecutor abandoned the effort to introduce only a part of the statement. (*Id.* at 265-67.)

Based on this record, the Michigan Court of Appeals reasonably found that Davis was not prejudiced by the prosecutor's use of the hearsay rules. The objections with respect to Wright and Featherstone were sustained, so the prior statements defense counsel wished to offer were admitted. Likewise, the court ruled that Diamos's entire statement to Quesada would be admissible. That ruling prompted the prosecutor to withdraw the question. Accordingly, the challenged actions by the prosecutor did not alter the evidence admitted at trial, giving the Michigan Court of Appeals a reasonable basis for rejecting the claim. *See, e.g., McCoy v. Floyd*, 2023 U.S. Dist. LEXIS 129177, *51 (E.D. Mich. July 26, 2023) ("To the extent that the trial court sustained [defense counsel's] objections, Petitioner cannot show that he was prejudiced by the prosecutor's conduct....")

Davis also argues that the prosecutor misrepresented the evidence during opening statement and closing argument. Misrepresenting facts in evidence by a prosecutor can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (quoting *Donnelly*, 416 U.S. at 646). Likewise, it is improper for a prosecutor during opening or closing arguments to bring to the jury any purported facts which have not been, or will not be, introduced into evidence and which are prejudicial. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). However, prosecutors must be given leeway to argue reasonable inferences from the evidence. *Id*.

Contrary Davis's argument, all of the challenged statements and arguments made by the prosecutor were supported by the evidence or were based on reasonable inferences drawn from the

evidence. Davis claims that Diamos was shot in the shoulder and not in the chest. But the treating physician described her wound as one to the upper right chest, and the pathologist testified that she died because the shotgun blast shredded her right lung. Similarly, the argument that Davis fired three shots was supported by police testimony that three fired casings were found at the scene. Finally, several officers testified that Davis failed to follow their instructions to drop the shotgun outside, but instead he chose to leave it inside the house with a claimed intruder, causing the delay in reaching Diamos. It was not unfair for the prosecutor to suggest that his conduct manifested an intent to delay the police. The characterization of the evidence by the prosecutor involved reasonable inferences based on the evidence presented and did not render Davis's trial fundamentally unfair.

The claims of prosecutorial misconduct presented on direct review were therefore reasonably rejected by the state court and do not warrant habeas relief.

### D

Davis also exhausted several allegations of ineffective assistance of trial counsel on direct appeal. Davis claimed that his attorney should have called three witnesses who would have testified regarding an intruder and that Davis shot at a white vehicle with Ohio license plates on the night of the incident. He also asserted that his attorney should have retained and called firearms and forensic expert witnesses to counter the prosecutor's experts. Finally, he claimed that his counsel should have used Quesada's text messages to Diamos to support his defense.

The Michigan Court of Appeals rejected the claims on the merits:

> Defendant also argues in his Standard 4 brief that defense counsel provided ineffective assistance by failing to call res gestae and expert witnesses, and objecting to the prosecutor's request to introduce text messages between the victim and Dana Quesada. Generally, to preserve an ineffective assistance of counsel argument, a defendant must file a motion for a new trial or *Ginther* hearing in the trial court to establish evidentiary support for the argument. *People v. Sabin (On*

29

*Second Remand)*, 242 Mich. App. 656, 658-659 (2000). Defendant failed to raise these arguments in a motion for a new trial or *Ginther* hearing in the trial court, and this Court denied defendant's motion to remand. *People v. Davis*, unpublished order of the Court of Appeals, entered October 17, 2017 (Docket No. 335051). Accordingly, our review is limited to the appellate record. *Sabin*, 242 Mich. App. at 658-659.

"The question whether defense counsel performed ineffectively is a mixed question of law and fact[.]" *People v. Trakhtenberg*, 493 Mich. 38, 47 (2012). We review a trial court's findings of fact for clear error, and questions of constitutional law de novo. *Id*[.]

To evaluate whether counsel provided effective assistance, we use the standard established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Hoag*, 460 Mich. 1, 5-6 (1999), citing *People v. Pickens*, 446 Mich. 298 (1994). The defendant must show: "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich. at 51. The effective assistance of counsel is presumed, *People v. Roscoe*, 303 Mich. App. 633, 644 (2014), and the defendant must overcome the presumption that defense counsel's actions constituted sound trial strategy, *Trakhtenberg*, 493 Mich. at 52. Further, the defendant must establish a factual predicate for his assertions. *Hoag*, 460 Mich. at 6.

We first hold that defendant failed to establish a factual predicate for his argument that defense counsel provided ineffective assistance by failing to call res gestae and other witnesses. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v. Payne*, 285 Mich. App. 181, 190 (2009). Generally, "the failure to call a witness can constitute ineffective assistance of counsel only when it 'deprives the defendant of a substantial defense.'" *Id*. (citation omitted). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v. Chapo*, 283 Mich. App. 360, 371 (2009) (quotation marks and citation omitted).

Defendant asserts that defense counsel should have called Quesada, Ohio State Trooper James Davis, and a third individual who may have seen defendant shooting at a white car with Ohio license plates on the morning of the victim's death, but fails to identify what information defense counsel should have coaxed out of Quesada and Davis, both of whom testified at trial, or the name of the supposed third res gestae witness. Further, he asserts that counsel should have introduced memory recollection, firearms, and forensic experts, but fails to demonstrate that such experts would have provided favorable testimony. Thus, he cannot show that counsel's performance fell below an objective standard of reasonableness for not calling these witnesses.

Defendant's third ineffective assistance of counsel argument fails for similar reasons. He contends that defense counsel should not have objected to the prosecutor's attempt to introduce text messages sent by Quesada to the victim, but fails to offer any proof rebutting the presumption that counsel's actions constituted sound trial strategy. "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v. Garza*, 246 Mich. App. 251, 255 (2001).

*Davis*, 2018 WL 1768072, at *10-11.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.*

Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (quoting *Harrington*, 562 U.S. at 112). The habeas petitioner bears the burden of demonstrating prejudice under this standard. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

The Michigan Court of Appeals reasonably applied this standard. The chief problem here is that Davis's claims are based on factual allegations outside of the record. Davis filed a pro se motion for an evidentiary hearing in the Court of Appeals. (ECF No. 8-17, PageID.2020-21.) The motion sought a hearing to establish the new factual allegations Davis interspersed among the arguments presented in his pro se supplemental brief. In his pro se brief, Davis claimed that on the

night of the incident he shot at two armed intruders from his bed, that he and Diamos saw vehicles following them from Ohio earlier that day, and that Diamos told Quesada about a possible outside threat in a text message. (ECF No. 8-17, PageID.1998-2000.) Davis also attached his own affidavit to his pro se brief which included the new factual allegations that his attorney failed to contact experts and failed to investigate Quesada, the Ohio State Trooper, and an unnamed individual who saw him shoot at a white vehicle with Ohio plates driving away from the scene. (*Id.* PageID.2018.)

Nowhere in his state court pleadings, however, did Davis include statements or affidavits from these witnesses as to the content of their additional testimony, that the witnesses were willing to testify in his defense, or the identity or proposed testimony of defense experts. The Michigan Court of Appeals thus denied the motion for an evidentiary hearing, stating "the motion to remand pursuant to Michigan Court Rule 7.211(C)(1) is denied. Defendant-appellant has not demonstrated that further factual development of the record or an initial ruling by the trial court is necessary at this time in order for this Court to review the issues on appeal." (*Id.*, PageID.2022.)

Davis claims that the state court erred in denying his motion for a hearing and that he is entitled to one here. But his failure to make an adequate offer of proof in support of his request for a hearing barred him from obtaining one in state court and it does so here as well. Under state law, there is no right to a hearing where a defendant fails to present an adequate offer of proof. *People v. Arrington*, 1999 Mich. App. LEXIS 1090, 1999 WL 33441318, at *2 (Mich. Ct. App. May 28, 1999). A defendant must "make some showing that a hearing [is] necessary," by, for example, producing evidence or filing "affidavits regarding the testimony of the [proposed] witnesses." *Id.* (citing *People v. Ginther*, 390 Mich. 436 (1973)); *see also Wilson v. Winn*, No. 12-14597, 2015 U.S. Dist. LEXIS 140172, 2015 WL 5999656, at *8 (E.D. Mich. Oct. 15, 2015) (holding habeas petitioner was not entitled to evidentiary hearing where, among other things, petitioner failed to

"present any evidence to the state courts in support of his ineffective assistance of trial or appellate counsel claims," and failed to present of an adequate offer of proof); *Anthony v. Bauman*, No. 10-13312, 2014 U.S. Dist. LEXIS 175971, 2015 WL 9583382, at *6 (E.D. Mich. Dec. 31, 2015) (same). The only thing offered by Davis to the state courts were unsupported factual allegations in a pro se brief and his own conclusory affidavit.

In any event, whether the Michigan Court of Appeals erred in its application of Rule 7.211 in denying Davis's motion for an evidentiary hearing is a question of state law that cannot be questioned here. *See Hayes v. Prelesnik*, 193 F. App'x. 577, 584 (6th Cir. 2006). There is no clearly established Supreme Court law which recognizes a constitutional right to a state court evidentiary hearing to develop a claim of ineffective assistance of counsel on appeal. *Id*. at 585. The failure to present a sufficient proffer of evidence to the state courts likewise bars him from obtaining a hearing in this Court. *See Cooey v. Coyle*, 289 F. 3d 882, 893 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(2)(A)(ii)).

Moreover, the Supreme Court has held that habeas review under 28 U.S.C. §2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). *Cullen* precludes the Court from considering new evidence that was not considered by the state courts when they adjudicated Davis's claims. *See Campbell v. Bradshaw*, 674 F.3d 578, 590, n.3 (6th Cir. 2012) (declining to consider testimony taken in federal evidentiary hearing because it was not part of the state court record).

Based on the record before it, the Michigan Court of Appeals reasonably rejected Davis's ineffective assistance of counsel claims. There simply was no factual basis offered to support his allegations. And contrary to Davis's allegations, counsel presented a reasonably effective defense that Davis was defending himself from intruders.

Of the many neighbors who testified to their observations on the night of the incident, it was defense counsel who called twelve of them in the defense case. The strategy was to elicit testimony from these witnesses that multiple male voices were heard in a loud argument prior to the sounds of gunfire, and that Davis appeared to be looking around at the street corner after the incident (suggesting that he chased away the intruders) and called for help.

Defense counsel also presented evidence in the defense case from the two Ohio officers tending to support the claim that there had indeed been in incident in Ohio with the Outlaws, that Davis actually thought he was being followed, and that Davis and Diamos were genuinely worried about outside trouble that night. Defense counsel presented evidence from multiple witnesses—Eagan, Feathersone, and the Wrights—that Diamos and Davis were concerned about an outside threat. In other words, counsel competently presented the defense that Davis now claims she was ineffective for ignoring.

There is simply no record evidence supporting the claim that counsel failed to present additional substantial evidence in support of the defense theory. Davis claims that he shot at a white vehicle with Ohio plates. But he fails to identify the witness who he claims saw this or attach any form of substantiation for the allegation. Davis himself voluntarily and personally chose not to testify in his own defense. (ECF No. 8-13, at 53-54.)

Davis claims that Quesada's written statement regarding the text message exchange with Diamos was somehow important to the defense, but he does not assert what the specific contents were. The record only shows that the prosecutor withdrew the question when the trial court ruled that the entire statement was admissible, and that defense counsel chose not to offer the complete statement on cross-examination. The presumption is that defense counsel made a reasonable tactical decision not to offer the full statement – likely because counsel wanted to avoid admission

of the part of the statement the prosecutor wanted to come in. Finally, Davis's claim regarding uncalled defense experts is wholly conclusory. He does not explain at all how a firearms expert or forensic evidence expert would have benefited the defense.

In short, by failing to include any substantial offer of proof, Davis proffered neither to the Michigan courts nor to this Court any evidence beyond his own general assertions to support his claims. As such, the Court of Appeals reasonably found that Davis failed to demonstrate that his counsel's performance was deficient or that he was prejudiced. *See Clark v. Waller*, 490 F. 3d 551, 557 (6th Cir. 2007); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998). Petitioner is therefore not entitled to habeas relief on his ineffective assistance of counsel claim.

## E

Davis also claimed on direct appeal that the cumulation of the alleged trial errors denied him his right to a fair trial. The Michigan Court of Appeals rejected the claim on the merits. *Davis*, 2018 WL 1768072, at *13. The claim fails here because it cannot be supported by clearly established Supreme Court law.

The United States Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Furthermore, the Sixth Circuit has ruled that such a cumulative error claim is not cognizable on habeas review. *See Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005). Davis thus fails to state a claim upon which habeas relief may be granted as to this issue.

## F

Petitioner's remaining claims were presented to the state courts in his motion for relief from judgment. The trial court found that review of the claims raised in the motion that had not

been raised on direct appeal were procedurally barred under Michigan Court Rule 6.508(D)(3). (ECF No. 19-4, PageID.2562-83.) The state appellate courts subsequently declined review with unexplained form orders. (ECF No. 19-8, PageID.2919; ECF No. 19-10, PageID.3108.) Respondent asserts that review of Davis's state post-conviction claims is barred by his procedural default.

Under the procedural default rule, a federal court acting on a state prisoner's habeas petition will not review a question of federal law if the last state-court judgment denying relief on the claim rests on a procedural state-law ground that is "independent of the federal question and is adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

The Sixth Circuit has held that Michigan Court Rule 6.508(D)(3) is such an "independent and adequate" ground to bar review of a habeas petitioner's federal claims. *Ivory v. Jackson*, 509 F.3d 284, 292 (6th Cir. 2007). Under Rule 6.508(D)(3), a court may not grant post-conviction relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom.

Neither the Michigan Court of Appeals nor the Michigan Supreme Court's orders refer to subsection (D)(3). Because those orders are ambiguous as to whether they refer to procedural default or a denial of relief on the merits, this Court must "therefore look to the last reasoned state court opinion to determine the basis for the state court's rejection" of Davis's state post-conviction claims. *See Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

In rejecting Davis's new claims, the trial court several times cited Rule 6.508(D)(3) and referenced that rule's requirement that a defendant show cause and prejudice for failing to raise an issue on direct appeal. The trial court concluded that under Rule 6.508(D)(3), Davis failed to show

either good cause or prejudice to excuse his failure to raise his new claims on direct review. (ECF No. 19-4, PageID.2562-81.) Because the trial court rejected these claims based on the independent and adequate procedural grounds stated in Rule 6.508(D)(3), these claims are procedurally defaulted. *See Ivory*, 509 F.3d at 292-93.

Review of these claims is barred unless Davis can demonstrate cause for the default and actual prejudice because of the alleged constitutional violation or that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750-51.

As cause to excuse his procedural default, Davis alleges ineffective assistance of appellate counsel. But he has not shown that appellate counsel was ineffective. It is well established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). "A brief that raises every colorable issue runs the risk of burying good arguments—those that ... go for the jugular—in a verbal mound made up of strong and weak contentions." *Id*. at 463 U.S. at 753 (cleaned up). Even so, "it is still possible to bring a *Strickland* claim based on [appellate] counsel's failure to raise a particular claim [on appeal], but it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith*, 477 U.S. at 536 (quoting *Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver

deficient performance and prejudice a defendant by omitting a "dead-bang winner," which is defined as an issue which was obvious from the trial record and would have resulted in a reversal on appeal. *Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Davis fails to show that appellate counsel's performance fell outside the wide range of professionally competent assistance by omitting his post-conviction claims. Appellate counsel filed an appellate brief that raised three issues. Appellate counsel reasonably chose to challenge the admission of the prior acts evidence under state law, given the trial court's decision to allow evidence of domestic abuse beyond the ordinary ten-year time limit. The state-law claim, though meritless, drew a dissenting opinion. Counsel also raised a substantial challenge under state law to the admission of Diamos's hearsay statements. Given the sheer number of prior statements admitted and their importance to the case, the decision to attack their admission was a strategically sound one. Finally, given the apparent frantic circumstances of the shooting, counsel reasonably chose to challenge the sufficiency of the evidence of premeditation and deliberation. None of the numerous new post-conviction claims appear to be clearly stronger than these three claims.

Furthermore, Davis filed his own pro se supplemental brief on direct appeal. That brief raised the claims of prosecutorial misconduct and ineffective assistance of counsel discussed above. Davis does not explain what prevented him from adding his new post-conviction review claims to his direct appeal supplemental brief. Davis's inability to explain his own failure to raise his new claims in that pleading undermines his claim that ineffective assistance of appellate counsel was the sole reason his claims were not raised on direct review. *See Sheffield v. Burt*, 731 F. App'x 438, 442 (6th Cir. 2018) (holding habeas petitioner failed to show cause under Rule 6.508(D)(3) for failing to raise issues on direct appeal and noting "[petitioner] had the opportunity

to raise any issues in his Standard 4 brief on direct appeal that he felt his appellate counsel should have raised" but he did not raise his defaulted issue).

The Court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983). Nonetheless, even assuming Davis established cause to excuse his default, he cannot establish prejudice because his claims lack merit for the reasons stated by the trial court in denying his motion for relief from judgment and as discussed by Respondent in the answer to the amended petition.

Another exception to the procedural default rule allows for review of defaulted claims where a failure to do so would result in a fundamental miscarriage of justice. The exception is reserved for the extraordinary case in which an alleged constitutional error probably resulted in the conviction of one who is actually innocent. *Dretke v. Haley*, 541 U.S. 386, 388 (2004). A claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Davis has not presented any new, reliable evidence to show that he is innocent. Indeed, the trial record reveals that the evidence of Davis's guilt was quite strong, and nothing offered in any of his claims undermines the Court's confidence that no fundamental miscarriage of justice occurred at his trial.

## IV

For the reasons stated, the Court concludes that Davis fails to establish entitlement to habeas relief with respect to any of his claims. Accordingly, the Court **DENIES WITH PREJUDICE** the amended petition for a writ of habeas corpus.

Before Davis may appeal this decision, the Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); Fᴇᴅ. R. Aᴘᴘ. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Davis must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). Davis has failed to make this showing. Accordingly, the Court **DENIES** a certificate of appealability.

Finally, for the reasons stated above, Davis's motion for an evidentiary hearing is **DENIED**.

**IT IS SO ORDERED.**

Dated: February 16, 2024                            s/Sean F. Cox                            
                                                    Sean F. Cox
                                                    U. S. District Judge

40